IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| BRIAN KINSELLA,<br><br>    Plaintiff,<br><br>vs.<br><br>JOHN BELFORTE, II, and BELTAPPO, INC.,<br><br>    Defendants. | No. 4:04-cv-00684-JEG<br><br>**ORDER ON<br>MOTION TO DISMISS** |

Presently before the Court is Defendants' Motion to Dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). This matter came on for hearing April 7, 2005. Representing Plaintiff Kinsella was Fred Anderson; representing Defendants John Belforte II and Beltappo, Inc., was Dennis Johnson. The matter is fully submitted and ready for disposition.

## I.  JURISDICTION

On December 7, 2004, Defendants removed this case from the Iowa District Court for Polk County, alleging diversity jurisdiction pursuant to 28 U.S.C § 1332. Plaintiff Brian Kinsella is a citizen of the State of Iowa. Defendant John Belforte II is a citizen of the State of Washington. The place of incorporation and the principal place of business of Defendant Beltappo, Inc., is also the State of Washington. Defendants allege the amount in controversy exceeds $75,000.

## II.  PERTINENT FACTS

Plaintiff Brian Kinsella has been involved in the wine industry since 1991 and started his own business, "The Wine Company", in 1995. In addition to operating

his own company, from June 1998 through June 2000, Kinsella was a full time consultant and vice president of marketing and sales for The Guardian Cork Company ("Guardian"), part of the Hettinga Technologies group, in Des Moines, Iowa. In his capacity as consultant, Kinsella helped develop and market Guardian's synthetic cork.

Defendant Beltappo, Inc. ("Beltappo"), is a distributor of synthetic corks which are used primarily by wine producers; Defendant John Belforte II is President of Beltappo.[1] In the Fall of 2000, Belforte came to Des Moines to discuss a possible business relationship with Guardian. During that visit, Belforte met Kinsella. No business relationship ever developed between Beltappo and Guardian.

In the Fall of 2000, Kinsella left Guardian. Shortly thereafter, discussions began between Kinsella and Belforte about Kinsella's representation of Beltappo's cork products.[2] On January 2, 2001, Belforte sent Kinsella a letter, indicating he was pleased Kinsella was interested in representing Belforte's cork products.

In the letter, Belforte discussed Kinsella's proposed position as Beltappo's exclusive agent in markets in Canada, South Africa, and the United States – east of the Rockies. In the letter, Belforte asked Kinsella for information he had about

---

[1] Beltappo, Inc., was formerly the Vigo Corporation; the name was changed in February of 2002. Letters and email from Defendant Belforte to Plaintiff Kinsella were signed by Belforte, either as President of Vigo Corporation or as CEO of Beltappo, Inc.

[2] The parties dispute who made the initial contact. Kinsella attests that Belforte telephoned him after learning that he was no longer with Guardian, and Belforte avers that it was Kinsella who made contact after leaving Guardian.

markets in Chile, Argentina, France, Greece, and Eastern Europe.  Belforte remarked that Kinsella's experiences and contacts could dramatically impact cork sales in those markets.  In conclusion, Belforte expressed that he looked forward to developing a mutually beneficial business relationship with Kinsella.  The letter was signed, John S. Belforte II, President – The Vigo Corp.

It is undisputed that Kinsella and Belforte entered into an oral agreement wherein Kinsella was Beltappo's exclusive agent in Canada and in the United States – east of the Rockies, and nonexclusive agent in other countries, including Italy and Chile.  According to the oral agreement, Kinsella was to receive commission from his gross sales.  During the course of the contract, Belforte directed all email, faxes, letters, and telephone calls to Kinsella in Iowa.

In February 2001, Belforte and Kinsella exchanged email regarding Kinsella's need for supplies and pricing lists for an upcoming wine show.  Belforte indicated he would send foreign and domestic price lists, as well as presentation samples and sample corks.  He also responded to observations Kinsella made regarding cork imperfections.  Belforte stated that he would pass along those observations to his associates as he continued to monitor the situation.

A few days later, Belforte sent Kinsella another email, expressing how pleased he was to be working with a well-trained and educated professional.  Belforte asked, "How were you going to test the wine that we bottled with Beltappo and with natural cork?  Can your test provide us any objective analytical evidence?  Could we generate

any type of empirical evidence with your help?" Belforte acknowledged that Kinsella would be ready to initiate trials as soon as samples were delivered. He posed to Kinsella questions regarding provisions for cork orders by smaller wineries in the United States and Canada, such as (1) the size of the orders; (2) whether a private logo would be needed; (3) the size and colors of corks; (4) value to the smaller wineries to have a quality cork immediately available; (5) selling price to these customers; (6) how often would they need corks; and (7) whether orders could be amalgamated to offer savings.

Kinsella responded to Belforte's questions regarding the smaller North American wineries, opining as to (1) the expected size and frequency of those orders; (2) Beltappo's need to fill those orders in a timely fashion or risk losing the business; and (3) competitive pricing. Kinsella also requested consulting expenses so he could attend trade shows, indicating he would eventually be earning those costs back when his agency fees kicked in.

In April 2001, Belforte and Kinsella exchanged email regarding bottling test trials Kinsella had performed on the Cortex cork samples. Kinsella relayed problems he encountered during the trials. Belforte concurred with Kinsella's opinions and indicated he had personally conveyed those opinions to his associates.

In September 2003, Beltappo sent an agreement entitled "Exclusive Agency Agreement"; it was signed by Belforte as President and Chief Executive Officer of

Beltappo; Kinsella never signed the agreement. A second proposed "Exclusive Agency Agreement" was sent to Kinsella in July 2004; neither party signed that agreement.

During his business relationship with Beltappo, Kinsella introduced Belforte to several wine distributors. Pertinent to this action were distributors in Chile and Spain – Gonsala Casas and Carolina Radman ("Casas/Radman"), and Rich Xiberta ("Xiberta"), respectively. Kinsella asserts that as a result of his fostering those relationships, Beltappo entered into distributorship agreements with Casas/Radman and Xiberta. In his Complaint, Kinsella alleges Beltappo has refused to pay him the portion of gross sales he is entitled to per their agreement.

On November 8, 2004, Kinsella filed a petition in Iowa District Court for Polk County against Belforte and Beltappo, alleging claims for breach of contract, quantum meriut, tortious interference with business relations, and tortious interference with prospective business advantage. On December 7, 2004, Defendants removed the action to this court. On January 18, 2005, Defendants' Des Moines attorney sent Kinsella a notice of termination of the exclusive agency agreement on behalf of Belforte and Beltappo. On January 6, 2005, Defendants filed the present motion to dismiss, alleging the court lacks personal jurisdiction over the Defendants.

### III. STANDARD FOR MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

When personal jurisdiction is challenged, plaintiff bears the burden of proving that such jurisdiction exists. Burlington Indus., Inc. v. Maples Indus., Inc., 97 F.3d 1100, 1102 (8th Cir. 1996). Despite plaintiff's ultimate burden of proof on the issue

5

of personal jurisdiction, "jurisdiction need not be proved by a preponderance of the evidence until trial or until the court holds an evidentiary hearing." Dakota Indus., Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1387 (8th Cir. 1991) (citing Cutco Indus., Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986)). "To survive a motion to dismiss for lack of personal jurisdiction, the plaintiff need only make a prima facie showing of personal jurisdiction over the defendant." Digi-Tel Holdings, Inc. v. Proteq Telecommunications (PTE), Ltd., 89 F.3d 519, 522 (8th Cir. 1996).

## IV.  DISCUSSION

A federal court sitting in diversity performs a two-prong analysis to determine if personal jurisdiction over a foreign defendant is permissible. Dakota Indus., Inc, 946 F.2d at 1387. First, the Court looks at whether jurisdiction is proper under the state's long-arm statute. Id. Second, if the activities of the Defendants meet the requirements of the statute, the Court next determines if the exercise of jurisdiction comports with due process. Id.

> Iowa's jurisdictional statute states in pertinent part,
>
> Every corporation, individual, personal representative, partnership or association that shall have the necessary minimum contact with the state of Iowa shall be subject to the jurisdiction of the courts of this state, and the courts of this state shall hold such corporation, individual, personal representative, partnership or association amenable to suit in Iowa in every case not contrary to the provisions of the Constitution of the United States.

Iowa Rule 1.306. The long-arm statute "expands Iowa's jurisdictional reach to the widest due process parameters of the federal constitution," therefore, the Court need

only consider whether the exercise of jurisdiction comports with due process. See also Hodges v. Hodges, 572 N.W.2d 549, 552 (Iowa 1997) (citing Larsen v Scholl, 296 N.W.2d 785, 787 (Iowa 1980)).

"[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945); Digi-Tel Holdings, Inc., 89 F.3d at 522. "Sufficient contacts exist when 'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there . . . .'" Moog World Trade Corp. v. Bancomer, S.A., 90 F.3d 1382, 1384 (8th Cir. 1996) (quoting World-wide Volkswagen Corp. v. Woodsen, 444 U.S. 286, 291-92 (1980)).

"'[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)). "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts . . . .'" Id. (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984)). If the contacts result from the Defendants' own actions, it creates a 'substantial connection' with the forum State and jurisdiction is proper. Digi-Tel Holdings, Inc., 89 F.3d at 522.

To determine if due process is satisfied, the Eighth Circuit employs a five factor test. Dakota Indus., Inc., 946 F.2d at 1390. The court considers,

> (1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties.

Id. (citing Land-O-Nod Co. v. Bassett Furniture Indus., 708 F.2d 1338, 1340 (8th Cir. 1983)).

The first three factors are given primary importance; the last two are secondary. Stanton v. St. Jude Med., Inc., 340 F.3d 690, 694 (8th Cir. 2003). The first three factors are closely interrelated and considered together. Digi-Tel Holdings, Inc., 89 F.3d at 523. In considering the Defendants' contacts with the forum, the Court looks at those contacts in the aggregate, not individually, and weighs the totality of the circumstances. Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A., 51 F.3d 1383, 1388 (8th Cir. 1995).

The Eighth Circuit has elaborated on the third factor, the relationship between the contacts and the cause of action, distinguishing between general and specific jurisdiction. Bell Paper Box, Inc. v. U.S. Kids, Inc., 22 F.3d 816, 819 (8th Cir. 1994) (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 nn. 8- 9 (1984)). "General jurisdiction refers to the power of a state to adjudicate any cause of action and does not depend on the relationship between the cause of action and the contacts." Burlington Indus., Inc., 97 F.3d at 1103 (citing Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc., 65 F.3d 1427, 1432 n. 4 (8th Cir. 1995)). To determine whether

general jurisdiction exists, the Court will look at whether the Defendants' contacts with the state are "continuous and systematic general business contacts." Helicopteros Nacionales de Colombia, S.A., 466 U.S. at 416 (citing Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 438 (1952)). Specific jurisdiction on the other hand, "refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum state . . . .'" Bell Paper Box, Inc. v. U.S. Kids, 22 F.3d at 819 (quoting Sondergard v. Miles, Inc., 985 F.2d 1389, 1392 (8th Cir. 1993)). To determine whether specific jurisdiction exists, the Court will look at the relationship between Plaintiff's claims and Defendants' activities within the forum. Morris v. Barkbuster, Inc., 923 F.2d 1277, 1280 (8th Cir. 1991).

In the present case, Defendants argue that neither general nor specific jurisdiction exists, and therefore this Court's assertion of personal jurisdiction would not comport with due process. Plaintiff resists, arguing the Defendants have sufficient minimum contacts with the State of Iowa to support a finding of specific jurisdiction.[3]

Defendants argue that when looking at the first three factors to determine personal jurisdiction – the quantity of the contacts, the nature and quality of the contacts, and the source and connection of the cause of action with those contacts – the Plaintiff is unable to meet his burden of proof that this Court has jurisdiction over them.

---

[3] Defendants argue their activities within the forum were not "continuous and systematic," and therefore a finding of *general* jurisdiction cannot be supported. See Helicopteros Nacionales de Colombia, S.A., 466 U.S. at 414. Plaintiff does not contest this; rather, he argues the record supports a finding of specific jurisdiction.

9

### A.     Quantity, Quality and Source of Contacts

Defendants emphasize that no representative from Beltappo has ever come to Iowa for the purpose of pursuing a business relationship with Plaintiff. In addition, they argue there are only a few contacts to analyze: telephone calls, letters, faxes, and email. Defendants assert that the use of interstate facilities are secondary or ancillary factors and cannot by themselves provide the requisite minimum contacts.

Defendants further assert that they did not initiate contact with Plaintiff; rather, Plaintiff contacted them and expressed interest in pursuing a business relationship. The parties disagree about who made the first contact regarding a business relationship. Plaintiff asserts it was Belforte who contacted him after finding out he was no longer with Guardian. Defendants deny this, arguing Kinsella first contacted Belforte in pursuit of a business relationship.

The January 2, 2001, letter diminishes the significance of Defendants' attempts to distinguish themselves as the pursued in the business relationship. The letter indicates Belforte was pleased Kinsella was interested in representing his company's cork products and anticipated a mutually beneficial relationship with Kinsella. While the initiating party may be a pivotal factor in some instances, it is but one factor in the analysis that is rendered less substantial as the matter so promptly became a matter of mutual interest.

> The experiences and contacts you have in those markets could dramatically impact cork sales . . . . It was a pleasure talking with you and to hear of your interest in representing our cork products. . . . I look forward to

>developing a mutually beneficial business relationship with you as we advance the sales and marketing of our wine cork products.

Belforte signed the letter as President and CEO of the Vigo Corporation ("Vigo"). It was in his capacity as President of Vigo that Belforte first met Kinsella during his visit to Iowa in pursuit of a business relationship between Vigo and Guardian.

The numerous contacts between Belforte and Kinsella, many of which were initiated by Belforte, also suggest a mutual relationship. Belforte and Kinsella exchanged continuing email after the January 2, 2001, letter. Some of those exchanges discussed cork testing. Defendants argue that any cork testing done by Kinsella was not solicited and was done for Kinsella's own benefit, not for the benefit of Beltappo. However, considered in the aggregate, the email indicates the communication regarding cork testing was mutual and interactive. For example, in an email to Kinsella on February 8, 2001, Belforte not only acknowledged Kinsella's quality testing but thanked him for conducting the tests. Belforte goes on to pose questions regarding further testing.

>How were you going to test the wine that we bottled with Beltappo and with natural cork? Can your test provide us any objective analytical evidence? Could we generate any type of empirical evidence with your help?

Defendants cite Bell Paper Box, Inc. v. Transwestern Plymers, Inc., 53 F.3d 920, 923 (8th Cir. 1995)[4] and Digi-Tel Holdings, Inc. v. Proteq Telecommunications (PTE),

---

[4] Bell Paper Box, Inc., was plaintiff in two unrelated Eighth Circuit cases involving personal jurisdiction challenges. Compare Bell Paper Box, Inc. v. Transwestern Plymers, Inc., 53 F.3d 920 (8th Cir. 1995) (finding that a single purchase order linking the defendant to the forum was not enough to support personal jurisdiction), with Bell Paper Box, Inc. v. U.S. Kids, 22 F.3d 816 (8th Cir. 1994) (finding physical presence is not required to support personal jurisdiction; rather, the

Ltd., 89 F.3d 519, 522 (8th Cir. 1996), and argue that letters and faxes themselves do not establish personal jurisdiction. Those cases are distinguishable when applied to the facts of the present case.

In Bell Paper Box v. Transwestern Plymers, Inc., defendant was a nonresident buyer, and his only contact with the forum was a single purchase. Bell Paper Box v. Transwestern Plymers, Inc., 53 F.3d at 922. In a two-to-one decision, an Eighth Circuit panel found that merely entering into a contract with a resident of the forum was not enough to support specific jurisdiction, especially when the defendant is the buyer.[5] Id. at 923.

---

correspondence between the parties, including transmission of items relevant to the contract, as well as performance of the contract within the forum, was enough to support a prima facie showing of personal jurisdiction because the defendant "sought the benefits and protection" of the forum).

[5] Judge Wollman's dissenting opinion in Bell Paper Box, Inc. v. Transwestern Plymers, Inc. is noteworthy. He reasoned that when defendant's contacts with the forum were viewed in isolation, without more as the majority viewed them, it was insufficient to support jurisdiction; but when viewed together, all factors were present and sufficient to support specific jurisdiction. Bell Paper Box, Inc. v. Transwestern Plymers, Inc., 53 F.3d at 924 (Wollman, J., dissenting).
> An inquiry as to the propriety of jurisdiction should not turn on a mere counting of the contacts, but rather on whether those contacts relate to the maintenance of . . . the forum in accord with 'fair play and substantial justice.' . . . [T]he exercise of specific jurisdiction over this particular contract dispute lies well within the recognized constraints of due process.

Id. Judge Wollman opined that it is the relatedness of the contacts to the cause of action that should be considered in determining whether maintenance in the forum accords with "fair play and substantial justice." Id. (citing Bell Paper Box, Inc. v. U.S. Kids, 22 F.3d at 819).

In Digi-Tel Holdings, the second case relied on by Defendants, the only contact the defendant had with the forum state was with a nonparty to the lawsuit. Digi-Tel Holdings, Inc., 89 F.3d at 521-22. Although the defendant made numerous faxes, letters, and telephone calls to the forum, the court found that communication could not be imputed to the defendant for purposes of personal jurisdiction and did not support specific jurisdiction. Id. at 523. The court found that under the facts of that case, the contacts were "inconsequential rather than substantial" and did not by themselves support jurisdiction because they were not at the heart of the dispute. Id.

Defendants assert that the only issue in this case is whether Kinsella is owed certain commissions and accordingly Belforte's contacts with the forum did not touch on the issues in dispute.

Defendants assert a much more narrow view of the issues in the present case than Plaintiff has alleged in his Complaint. While a portion of Plaintiff's *damages* may be lost commissions, the issues in the case are not limited to lost commissions. Plaintiff asserts causes of action for breach of contract, quantum meriut, tortious interference with contractual relations, and tortious interference with prospective business relationships. Defendants' contacts with the forum were directly related to those causes of action. The Belforte-Kinsella email exchanges detail many facets of the parties' contractual relationship including the amount and type of work Kinsella performed, Kinsella's industry contacts and Belforte's acknowledgment of Kinsella's suggestions and concerns. These contacts have a direct bearing on the issues in the case.

Defendants also argue that neither Belforte nor Kinsella ever contemplated that Kinsella would solicit business or make sales on behalf of Beltappo in Iowa, and, moreover, Kinsella never sold Beltappo corks to Iowa buyers. There is no dispute that Kinsella was the exclusive agent in the United States, east of the Rockies. Kinsella's region in the U.S. was limited to "east of the Rockies" which includes Iowa. Furthermore, Belforte noted that Kinsella's "experience and contacts" in the named regions would be an advantage to Beltappo. Accordingly, it should have been reasonably foreseeable to Belforte that as an Iowa resident, Kinsella's contacts and experience would include Iowa contacts and experience.

Citing Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc., Defendants recast the parties' mutual contacts as unilateral contact made by Plaintiff and argue that such unilateral activity is not enough to satisfy due process. Wessels, Arnold & Henderson, 65 F.3d at 1432 ("[T]he unilateral activities of one claiming some relationship with the non-resident defendant is not enough to satisfy the minimum contacts requirement.").

Defendants' reliance on Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc., is misplaced. Although the Wessels court did reason that phone calls and mail *alone* do not constitute minimum contacts, the court went on to reason that those contacts *are* evidence of "a continuous, systematic business relationship." Id. at 1433. In fact, in Wessels, all correspondence from the defendant was directed at the forum where plaintiff was to perform the contract at issue. Id. The court found that lack of physical presence in the forum *did not* defeat personal jurisdiction. Id. ("So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have

consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there."). The <u>Wessel</u> court found that "[t]aken as a whole, the nature, quantity, and quality of the contacts and the relationship of the contacts to the cause of action sufficiently meet the due process requirements of personal jurisdiction." <u>Id.</u> at 1434.

The record in this case provides adequate evidence that the activities in the forum were purposefully directed at Kinsella and were mutual, rather than unilateral. There are numerous email strings which show an exchange of questions and answers between Kinsella and Belforte. Belforte asks Kinsella for information and feedback from Kinsella's experience as a wine consultant in Iowa by and through contacts Kinsella made while in Iowa. Belforte sent samples to Kinsella in Iowa. Kinsella performed cork testing in the forum. The record shows that Belforte availed himself to the results of those tests, asking Kinsella specific questions, including questions about further testing, all to the apparent end of obtaining test results most useful to Belforte and his business enterprise.

Taken as a whole, the evidence of Defendants' contacts with the forum which relate to the claims in suit are sufficient to meet the due process requirements of personal jurisdiction. <u>Id.</u>; <u>see also</u> <u>Bell Paper Box, Inc. v. U.S. Kids</u>, 22 F.3d at 819 (finding physical presence is not required to support personal jurisdiction; rather, the correspondence between the parties, including transmission of items relevant to the contract, as well as performance of the contract within the forum, was enough to support a prima facie showing of personal jurisdiction because the Defendant "sought the benefits and protection" of the forum).

### B.      Interest of the Forum and Convenience of the Parties

Defendants present a conclusory assertion that analysis of the final two factors – the interest of the forum state and the convenience of the parties – does not change the conclusion that the Defendants do not have the requisite contact with Iowa to subject them to jurisdiction in the state. That is, although Iowa has an obvious interest in providing a local forum, that interest does not make up for the absence of minimum contacts. Defendants further assert that the convenience of parties favor neither side because witnesses are in both Washington and Iowa. Plaintiff does not address the final two factors.

The Eighth Circuit has assumed without discussion that a state has an interest in providing a forum for its residents. Aylward v. Fleet Bank, 122 F.3d 616, 618 (8th Cir. 1997) ("With respect to the fourth [factor], we assume that Missouri has an interest in providing a forum for its residents."). In the present case, the Court may also assume Iowa has an interest in providing a forum for Kinsella. As for the fifth and final factor, the evidence as Defendants suggest is neutral; the convenience of the parties does not favor one party or the other.[6]

---

[6] Distinguishing Calder v. Jones, 465 U.S. 783, 790 (1984), Defendants' final assertion is that the Court should not confer personal jurisdiction merely because Plaintiff has alleged intentional torts. In Calder, the plaintiff was the alleged victim of a libelous article written by a Florida-based magazine. Id. at 785. The case was filed in California, so the only apparent connection between the defendant and the forum was plaintiff's status as a resident of California. Id. at 790. The Supreme Court approved the use of the "effects test" which provides that when an intentional tort is committed, the defendant is subject to personal jurisdiction in the forum where the harm is suffered. Id. ("An individual injured in California need not go to Florida to

However, in applying these secondary factors, the Court considers and gives deference to the Plaintiff's chosen forum. Northrup King Co., 51 F.3d at 1389 ("A plaintiff normally is entitled to select the forum in which it will litigate."). Therefore, the two secondary factors – interest of the forum and convenience of the parties – weigh in favor of the Plaintiff. [7]

---

seek redress from persons who, though remaining in Florida, knowingly cause the injury in California.").

By analogy, Defendants cite Klooster v. North Iowa State Bank, 404 N.W.2d 564, 570 (Iowa 1987), and argue Plaintiff's intentional tort claims cannot be maintained; therefore, the Court should not look to them to confer personal jurisdiction. Defendants assert, based on Klooster, it is unlikely in a simple breach of contract action under Iowa law, that Plaintiff will be able to maintain either his intentional interference with contract or intentional interference with prospective business relationship claims; therefore, the Court should not confer personal jurisdiction upon the Defendants based on the existence of an intentional tort. Id.

Defendants misapply the holding in Klooster. The Klooster court found that the plaintiff could not maintain an action for intentional interference with existing contract in that case because no third party was involved and if the alleged conduct had occurred, the plaintiff had a remedy in contract. Id. at 570. That is not to say that a tortious interference claim can never be maintained in a breach of contract action.

In the present case, whether Plaintiff's intentional tort claims can be maintained is a nonissue because the Court need not look to those claims for a jurisdictional hook. Defendants' contacts with Iowa comport with due process, and therefore personal jurisdiction is proper apart from Plaintiff's intentional tort claims.

[7] Minimum contacts for purposes of personal jurisdiction must be assessed as to each defendant. Calder, 465 U.S. at 790. In the present case, negotiations and communication with Plaintiff Kinsella were made by Defendant Belforte in his own name, or in his capacity as President of Vigo/CEO of Beltappo, Inc. Therefore, on the record currently before the Court, the conduct of Defendant Belforte is inseparable from the conduct of Defendant Beltappo, Inc.

At this stage of the litigation, Plaintiff need only make a prima facie showing of personal jurisdiction. Digi-Tel Holdings, Inc. v. Proteq Telecommunications (PTE), Ltd., 89 F.3d 519, 522 (8th Cir. 1996). The Court finds Plaintiff has made a prima

17

## V.  CONCLUSION

Defendants' contacts with Iowa are more than random, fortuitous, or attenuated. Defendants continuously availed themselves to Plaintiff's resources within the state, received them, and benefit from them.  Plaintiff has met his burden of showing a prima facie case of personal jurisdiction.  For the reasons stated, the Court finds personal jurisdiction comports with due process.  Accordingly, Defendants' Motion to Dismiss for lack of personal jurisdiction [Clerk's No. 5] must be **denied**.

**IT IS SO ORDERED.**

Dated this 2nd day of June, 2005.

JAMES E. GRITZNER, JUDGE
UNITED STATES DISTRICT COURT

---

facie showing of personal jurisdiction over both Defendant Belforte and Defendant Beltappo, Inc.  <u>Dakota Indus., Inc. v. Dakota Sportswear, Inc.</u>, 946 F.2d 1384, 1387 (8th Cir. 1991).